UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CENTURY 21 REAL ESTATE LLC, a        CASE NO. CIV. 2:10-2751
Delaware Limited Liability
Company formerly known as
Century 21 Real Estate
Corporation,

         Plaintiff,

    v.

ALL PROFESSIONAL REALTY, INC.,
a California corporation doing
business as CENTURY 21 ALL
PROFESSIONAL; STEVEN M.
WRIGHT, an individual; and
CAROL WRIGHT, an individual,

         Defendants.
_____/

STEVE WRIGHT, CAROL WRIGHT and        CASE NO. CIV. 2:10-2846
ALL PROFESSIONAL REALTY, INC.,

         Plaintiffs,

    v.                                MEMORANDUM AND ORDER RE:
                                      MOTIONS FOR A PRELIMINARY
CENTURY 21 REAL ESTATE LLC,           INJUNCTION
and DOES 1-100, inclusive,

         Defendants.
_____/

1

----oo0oo----

Century 21 Real Estate LLC ("Century 21") filed an action against All Professional Realty, Inc. ("All Professional"), Steven M. Wright, and Carol Wright arising from All Professional's continued use of Century 21's trademarks following the terminations of real estate brokerage franchise agreements for unpaid fees.  (No. 2:10-2751.)  Steve Wright,[1] Carol Wright, and All Professional filed a related action against Century 21 arising from the franchise agreements.  (No. 2:10-2846.)  Presently before the court are Century 21's motion for a preliminary injunction against All Professional, Steve Wright, and Carol Wright in the action initiated by it and Steve Wright, Carol Wright, and All Professional's motion for a preliminary injunction against Century 21 in the action initiated by them.

Both sides' motions for preliminary injunction were originally set for hearing on December 20, 2010.  In order to accommodate the various evidentiary objections made by each side to the declarations submitted by the other, the court permitted the parties to file supplemental declarations to cure the alleged defects and permitted the parties to call witnesses to testify in support of or opposition to the motions.  An evidentiary hearing was held on January 11, 2011.

I.   Factual and Procedural Background

---

[1]   The parties use "Steve Wright" and "Steven M. Wright." Because he is captioned as Steve Wright in the action initiated by him, the court will use Steve Wright.

2

In 1994, Steve and Carol Wright formed All Professional, a real estate brokerage company.  (Steve Wright Decl. in Supp. of Mot. for P.I. against Def. Century 21 ("Steve Wright Decl. II") ¶ 2 (No. 2:10-2846, Docket No. 9); Carol Wright Decl. in Supp. of Mot. for P.I. against Def. Century 21 ("Carol Wright Decl. II") ¶ 2 (No. 2:10-2846, Docket No. 9); see also Steve Wright Decl. in Opp'n to Century 21's Mot. for P.I. against Defs. ("Steve Wright Decl. I") ¶ 2 (No. 2:10-2751, Docket No. 18); Carol Wright Decl. in Opp'n to Century 21's Mot. for P.I. against Defs. ("Carol Wright Decl. I") ¶ 2 (No. 2:10-2751, Docket No. 18).)  All Professional signed its first franchise agreement with Century 21 in 1995, which allowed it to operate an office under the name "Century 21 All Professional."  (Steve Wright Decl. II ¶ 3; Carol Wright Decl. II ¶ 3; see also Steve Wright Decl. I ¶ 3; Carol Wright Decl. I ¶ 3.)  Century 21 is a franchisor of real estate brokerages.  (Bertet Decl. in Supp. of Opp'n by Century 21 to Pls.' Mot. for P.I. ("Bertet Decl.") ¶ 3 (No. 2:10-2846, Docket No. 12); see also Rudin Decl. in Supp. of Reply of Mot. for P.I. by Century 21 against Defs. ("Rudin Decl. I") Ex. A, ¶ 3 (No. 2:10-2751, Docket No. 22).)

All Professional operates multiple offices and each office is governed by a separate franchise agreement with Century 21.  In November of 2005, All Professional signed three ten-year franchise agreements with Century 21 for two offices in Sacramento and one office in Folsom, California, with an effective date of December 1, 2005, for each franchise agreement. (Bertet Decl. Exs. A–C §§ 1.5, 1.7; see also Iuliano Decl. in Supp. of Century 21's Mot. for P.I. against Defs. ("Iuliano Decl.

3

1   I") Exs. B-C §§ 1.5, 1.7 (No. 2:10-2751, Docket No. 10).)  The

2   Wrights state that at the time they signed the franchise

3   agreements on behalf of All Professional they were told that

4   Century 21 would be providing "new" tools and systems to grow

5   their offices.  (Steve Wright Decl. II ¶ 4; Carol Wright Decl. II

6   ¶ 4; see also Steve Wright Decl. I ¶ 4; Carol Wright Decl. I ¶

7   4.)  The Wrights signed a personal guaranty.  (Bertet Decl. Exs.

8   A-C at 43-44; see also Iuliano Decl. I Exs. B-C at 43-44.)

9        Section 4.1 of the franchise agreements granted All

10  Professional the nonexclusive license to use Century 21's "Marks"

11  and "System."  (Bertet Decl. Exs. A-C § 4.1; see also Iuliano

12  Decl. I Exs. B-C § 4.1.)  "Marks" meant Century 21's trademarks,

13  service marks, and trade dress.  (Bertet Decl. Exs. A-C § 3.1.8;

14  see also Iuliano Decl. I Exs. B-C § 3.1.8.)  "System" meant,

15  inter alia, "policies, procedures, and techniques designed to

16  enable [] offices to compete more effectively in the real estate

17  sales market."  (Bertet Decl. Exs. A-C § 3.1.14; see also Iuliano

18  Decl. I Exs. B-C § 3.1.14.)  Century 21's System also included

19  "common use and promotion of certain Marks, copyrights, trade

20  secrets, centralized advertising programs, recruiting programs,

21  referral programs and sales management training programs." (Id.)

22       Century 21 has numerous registered trademarks.  (See

23  Iuliano Decl. I ¶¶ 3-4, Ex. A; see also Iuliano Decl. in Supp. of

24  Opp'n by Century 21 to Pls.' Mot. for P.I. ("Iuliano Decl. II")

25  ¶¶ 3-4, Ex. A (No. 2:10-2846, Docket No. 18).)  According to

26  Century 21, Century 21 uses the trademarks on goods and in

27  advertisements, education, training manuals, newsletters, global

28  computer networks, and residential, commercial, and mortgage

4

brokerage services. (Iuliano Decl. I ¶ 6; <u>see also</u> Iuliano Decl. II ¶ 6.) The trademarks have become well recognized because of advertisements and promotions of goods and services offered by Century 21. (Iuliano Decl. I ¶ 6; <u>see also</u> Iuliano Decl. II ¶ 6.)

In exchange for the rights granted under the franchise agreements, All Professional agreed to pay royalty fees of six percent of gross revenue, with an initial monthly minimum fee of $500.00, due at the time of settlement or close of escrow. (Bertet Decl. Exs. A-C §§ 7-8; <u>see also</u> Iuliano Decl. I Exs. B-C §§ 7-8.) All Professional also agreed to pay two percent of its gross revenue for a National Advertising Fund ("NAF") for advertising expenses, with an initial monthly minimum fee of $562.00, due on the tenth of the following month.

Section 16.2.3 of the franchise agreements provided that Century 21 could terminate the agreement for good cause, which included curable and non-curable defaults. (<u>Id.</u> § 16.2.3.) Section 16.2.4, governing termination for curable defaults, provided that Century 21 could terminate the agreement with 30 days notice of the "proposed termination and the opportunity to cure the breach during the entire notice period, or such longer or shorter notice as is required or permitted by the law of the state where the Office is located," if the curable breach was the failure to pay financial obligations. (<u>Id.</u> § 16.2.4.)

In addition to entering into the three franchise agreements in November of 2005, All Professional borrowed $75,000.00 from Century 21 pursuant to a Development Advance

Promissory Note ("Note").  The Note provided for a long-term,
annual repayment plan.  (Bertet Decl. Ex. D; <u>see also</u> Iuliano
Decl. I Ex. D.)  The Wrights signed a personal guaranty of the
Note.  (<u>Id.</u>)  Provided that All Professional was not in breach of
its franchise agreements, the yearly amount due would be forgiven
if All Professional reached certain gross revenue annual
thresholds.  (<u>Id.</u>)  The Wrights state that they executed the Note
relying on statements from Century 21 that it would provide All
Professional with the "necessary" tools, resources, and systems
to enable All Professional to meet the threshold requirements.
(Steve Wright Decl. II ¶ 7; Carol Wright Decl. II ¶ 6; <u>see also</u>
Steve Wright Decl. I ¶ 7; Carol Wright Decl. I ¶ 7.)  Thereafter,
All Professional did not meet the annual thresholds and thus
annual payments were not forgiven.  (Steve Wright Decl. II ¶ 8;
Carol Wright Decl. II ¶ 7; <u>see also</u> Steve Wright Decl. I ¶ 8;
Carol Wright Decl. I ¶ 8.)  The Wrights state that All
Professional was unable to meet the threshold requirements
because Century 21 failed to provide the necessary tools,
resources, and systems.  (Steve Wright Decl. II ¶ 8.; Carol
Wright Decl. II ¶ 7; <u>see also</u> Steve Wright Decl. I ¶ 8.; Carol
Wright Decl. I ¶ 8.)  When All Professional failed to make its
annual payment for 2007, Century 21 offered to cancel the payment
in exchange for a one-year extension of each franchise agreement
and a general release of claims.  (Suppl. Steve Wright Decl. in
Supp. of Pls.' Mot. for P.I. ("Suppl. Steve Wright Decl.") ¶ 8,
Ex. 12 (No. 2:10-2846, Docket No. 13).)  All Professional
rejected Century 21's offer: "I refused to agree to release
Century 21 from any liability because I thought that Century 21's

representatives had actively misrepresented material facts to me. I did not believe that such a request was proper, and I felt that Century 21 was violating its duties to me by asking for such a waiver." (Steve Wright Decl. II ¶ 8; <u>see also</u> Steve Wright Decl. I ¶ 8.)  Century 21 rejected All Professional's counteroffer. (Suppl. Steve Wright Decl. ¶ 8, Ex. 12.)  Thereafter, All Professional failed to make its annual payments on the Note.

Beginning in 2008, Steve Wright informed Century 21 about franchisees "openly competing with [him] and stealing [his] business and employees" in violation of Century 21's "Code of Conduct."[2]  (Steve Wright Decl. II ¶ 9; <u>see also</u> Carol Wright Decl. II ¶ 8; Steve Wright Decl. I ¶ 9; Carol Wright Decl. I ¶ 9.)  Steve Wright states that in about 2006 other Century 21 franchisees in the area began hiring agents away from All Professional and one Sacramento franchisee "stole" a commission check from All Professional.[3]  (Steve Wright Decl. II ¶ 9; <u>see also</u> Steve Wright Decl. I ¶ 9.)

All Professional began to experience "short term cash

_____

[2]   Century 21's Policies and Procedures Manual stated that franchisees "should avoid" recruiting sales associates of other franchisees and "advised that aggressive sales associates recruiting practices may subject the broker involved to claims of business interference by other brokers under applicable state law."  (Steve Wright Decl. in Supp. of Mot. for P.I. against Century 21 ("Steve Wright Decl. I") Ex. 2 (No. 2:10-2846, Docket No. 9); <u>see also</u> Steve Wright Decl. in Opp'n to Century 21's Mot. for P.I. ("Steve Wright Decl. II") Ex. 2 (No. 2:10-2751, Docket No. 18).)

[3]   Steve Wright states that Century 21 also refused to do anything when a real estate office, not affiliated with Century 21, moved into the Folsom area operating as "21st Century Realty," arguably diluting All Professional's trade name as "Century 21 All Professional."  (Steve Wright Decl. I ¶ 11; <u>see also</u> Steve Wright Decl. II ¶ 11.)

7

1  flow problems in 2009" and decided to "temporarily" close the

2  Folsom office.  (Steve Wright Decl. II ¶ 10; <u>see also</u> Steve

3  Wright Decl. I ¶ 10.)  Another Century 21 franchisee then moved

4  into the office that All Professional had vacated. (Steve Wright

5  Decl. II ¶ 10; <u>see also</u> Steve Wright Decl. I ¶ 10.)  Steve Wright

6  states that he "continued to complain to Century 21 about the

7  misrepresentations by Century 21 and the actions of other Century

8  21 franchisees" and became "concerned" that Century 21 was

9  "actively trying" to "run us out of business." (Steve Wright

10 Decl. II ¶ 11; Steve Wright Decl. I ¶ 11.)  Steve Wright had

11 heard "rumors" from other franchisees' agents that All

12 Professional was being "forced out" and that other franchisees

13 should recruit All Professional's agents.  (Steve Wright Decl. II

14 ¶ 11; Steve Wright Decl. I ¶ 11.)

15        With respect to Steve Wright's complaints to Century

16 21, Century 21 had no obligation in the agreements to prevent

17 other franchisees from recruiting All Professional's agents.  To

18 the contrary, Century 21 did not have the right to do so.

19 Section 21.2 provided:

20        [Century 21] will have no obligation to pay your
          commissions, taxes, wages or other expenses, and will
21        have no right to regulate or participate in the
          recruitment, selection, engagement, retention, discipline
22        or termination of your sales associates or employees, or
          to determine or limit the parties from whom you may
23        accept listings or to or for whom you may sell property,
          the commission rates you charge, the commission splits
24        between you and your sales associates, your working
          conditions, the manner or details of work performed by
25        you or your sales associates or employees, except as may
          be necessary to protect the Marks and goodwill.
26
   (Bertet Decl. Exs. A-C § 21.2; <u>see also</u> Iuliano Decl. I Exs. B-C
27
   § 21.2.)  The remedy, as brought out at the evidentiary hearing,
28

                                    8

1  was for All Professional to sue Select, the Century 21 franchisee
2  that allegedly recruited All Professional's agents and moved into
3  the same Folsom office that All Professional vacated.

4        According to Steve Wright's testimony, Bob Popp, a
5  field representative for Century 21, did call Select about Steve
6  Wright's complaints, even though Century 21 was not required to
7  do so.  It was Steve Wright's belief that Select denied
8  recruiting All Professional's agents.  This left Century 21 in
9  what the court would characterize as a "he-said, she-said"
10  dilemma.  Century 21 did not have the right to run either
11  business.  It was at best in the position of a mediator, with no
12  authority to enforce sanctions against either party.  Steve
13  Wright testified that he did not know what Bob Popp did beyond
14  making a call, and the court finds it quite possible that Century
15  21 did do something about Steve Wright's complaint.  Regardless,
16  Select's alleged recruiting of All Professional's agents was no
17  excuse for All Professional to stop paying fees to Century 21.

18        There is also no evidence that Century 21 cut off
19  recruiting training because of Steve Wright's complaints.  Steve
20  Wright complained in 2008, and in that year Tara Scholl of
21  Century 21 cut off recruiting training.  No connection between
22  the recruiting training and the complaints has been shown.

23        Beginning in May of 2009, All Professional stopped
24  paying many of its franchise fees.  All Professional knew it had
25  failed to pay them.  Century 21's System provides its franchisees
26  with "detailed summaries of their account balances owed to
27  Century 21, including specific information detailing the amounts
28  owed by that franchisee, when the amounts are due, and the type

of amount due (i.e., royalty fee, national advertising fee fund

fee, Development Advance Note, etc.)[.]" (Suppl. Rodriguez Decl.

in Supp. of Opp'n by Century 21 to Pls.' Mot. for P.I. ("Suppl.

Rodriguez Decl.") ¶ 4 (No. 2:10-2846, Docket No. 19).); <u>see also</u>

Rudin Decl. I Ex. A ¶ 21.)   All Professional had access to these

detailed account summaries. (Suppl. Rodriguez Decl ¶ 4; <u>see also</u>

Rudin Decl. I Ex. A ¶ 21.)   Century 21 has provided the Custom

Account Reports for each franchise agreement. (Suppl. Rodriguez

Decl Ex. A; <u>see also</u> Iuliano Decl. I Exs. I-J.)   The Custom

Account Report specifies the date, amount, transaction type, and

due date.

   In letters dated April 5, 2010, Century 21 notified All

Professional of its intent to terminate the three agreements and

of All Professional's opportunity to cure. (Bertet Decl. Exs. E-

G; <u>see also</u> Iuliano Decl. I Exs. E-F.)   The notice pertaining to

the River Park Drive office stated in pertinent part:

> Century 21 has advised you on numerous occasions that you
> are delinquent in the payment of your account.   Upon
> review, we have determined that you are in default of the
> above-referenced Agreement for failing to pay fees when
> due.   Your default constitutes a material breach of the
> Agreement, for which Century 21 may terminate the
> franchise.
>
> As of February 24, 2010, your account balance for this
> office was $59,327.41.
>
> In order to avoid termination, you must pay the balance
> in full <u>no later than May 10, 2010.</u>

(Bertet Decl. Ex. E; <u>see also</u> Iuliano Decl. I Ex. E.)   The notice

also provided contact information for Jacqueline Bertet, Century

21's Senior Director of Financial Services, and informed All

Professional that failure to pay the balance would result in

immediate termination of the franchise, which would then require

10

All Professional to pay the amount past due at the time of termination, sums assessed in a post-termination audit, the remaining balance of the Note, and lost profits. (Bertet Decl. Ex. E; see also Iuliano Decl. I Ex. E.) The notice pertaining to the Florin Road, Sacramento, office contained similar language and stated that the balance was $23,492.69 as of February 24, 2010, requiring payment by May 10, 2010. (Bertet Decl. Ex. G; see also Iuliano Decl. I Ex. F.) The notice pertaining to the Folsom office contained similar language and stated that the balance was $13,274.34 as of February 24, 2010, and required payment by May 10, 2010. (Bertet Decl. Ex. F.)

Following receipt of the notices, both Steve and Carol Wright called representatives of Century 21. Carol Wright called Shalina ("Shelly") Rodriguez, a Director of Financial Services for Century 21. Carol Wright states that in the telephone call she asked for an accounting and "disputed certain discrepancies I saw in the notices of default." (Carol Wright Decl. II ¶ 12; see also Carol Wright Decl. I ¶ 13.) Carol Wright states that she identified the following issues in the telephone call: (1) the default amounts included amounts owed under the Note, which was not part of a franchise agreement; (2) Century 21 was "trying" to charge fees for the Folsom office even though it had been closed since August of 2009; and (3) there was a credit that All Professional should have received. (Carol Wright Decl. II ¶ 12; see also Carol Wright Decl. I ¶ 13.)

Carol Wright "specifically asked what would be required to resolve the claimed default":

[Rodriguez] informed me that we would need to pay

11

$124,432.20 and that Corporate would want a promissory
note since the figure was greater than $100,000.  Our
discussion revealed that Corporate was including the
outstanding amount allegedly owed under [the Note],
even though payment was not required under any of the
Franchise Agreements.  The pay-off amount included the
Hawaii office even though that franchise was owned by a
separate entity.

(Suppl. Carol Wright Decl. in Supp. Of Pls.' Mot. for P.I.

("Suppl. Carol Wright Decl.") ¶ 4 (No. 2:10-2846, Docket No.

13).)

        In her declaration, Rodriguez states that she received

the call from Carol Wright on May 6, 2010, and Carol Wright

stated that she wanted to discuss a "possible payment plan for

the amounts owed." (Suppl. Rodriguez Decl. ¶ 2.)  Wright did not

ask for an accounting, nor did she state that All Professional

would pay the amounts due upon receipt of an accounting.  (Id.)

        Following the phone conversation, Carol Wright e-mailed

a letter to Rodriguez identifying "items we need to address

before proceeding": (1) removing minimum royalty and NAF fees

from the Folsom office account balance because it had been closed

since August 31, 2009; (2) determining the cutoff date for "final

payment calculations," with a possible date of March 31, 2010;[4]

(3) "handling" the Hawaii office separately; (4) removing minimum

royalty and NAF fees from January, February, and March of 2010;

(5) separating the Note amount owed because of a "separate issue"

as to why All Professional was not paying it; and (6) crediting

$304.50 because of a Century 21 error.  Lastly, Carol Wright

---

        [4]   This appears to be in reference to a possible payment
plan for the amounts owed, with March 31, 2010, being the cutoff
date for determining the total amount owed under the payment
plan.

stated that the "totals will obviously have to be recalculated before we can talk about payment arrangements" and said that she would make payments on "April 2010 transactions to start anew."[5] (Carol Wright Decl. II Ex. 8; see also Carol Wright Decl. I Ex. 8.)

Steve Wright states that All Professional took issue with the notices of default because they (1) included amounts owed under the Note and (2) because there were "some questionable amounts included in the calculation of default." (Steve Wright Decl. II ¶ 13; see also Steve Wright Decl. I ¶ 13.) Based on conversations with representatives of Century 21, Steve Wright states that he believed that "Century 21 was working to correct the accounting errors and would be contacting [them] to resolve the issues so [they] could work out a plan to cure the default." (Steve Wright Decl. II ¶ 13; see also Steve Wright Decl. I ¶ 13; Suppl. Steve Wright Decl. ¶ 5.)

Shortly after May 17, 2010, when Rodriguez returned from vacation, she and the Wrights spoke again about a possible payment plan. (Suppl. Rodriguez Decl. ¶ 6.) Rodriguez did not agree to provide the Wrights with a revised accounting "because at no time did [she] tell Steve or Carol Wright that any of the amounts Century 21 was seeking to collect under separate franchise agreements were not in fact owed to Century 21." (Id. ¶

---

[5] The evidentiary hearing revealed that while All Professional may have resumed paying royalty fees on current transactions, beginning in April of 2010, it still continued to fail to pay NAF fees on current transactions. (See Suppl. Rodriguez Decl. in Supp. of Opp'n by Century 21 to Pls.' Mot. for P.I. ("Suppl. Rodriguez Decl.") ¶ 10 (No. 2:10-2846, Docket No. 19).) Thus, All Professional continued to fall behind on its franchise fees.

6.)  Rodriguez and the Wrights spoke again in mid-June "to discuss the terms of a possible payment plan of amounts owed by All Professional," but these discussions were not successful, according to the Wrights' testimony and Rodriguez's declaration. (Id. ¶ 10.)  All Professional never did pay the unpaid franchise fees.

In letters dated July 7, 2010, Century 21 terminated the franchise agreements governing the two Sacramento offices, effective July 9, 2010.[6]  (Bertet Decl. Exs. H-I; see also Iuliano Decl. I Exs. G-H.)  The letter regarding the River Park Drive office stated that the account balance was $72,407.97 as of July 6, 2010, an additional $41,667.00 was owed under the Note, and an additional $250,029.34 was owed for lost profits, pursuant to calculations prescribed by the franchise agreement.  The letter regarding the Florin Road office stated that the account balance was $33,934.30 as of July 6, 2010, and an additional $155,671.48 was owed for lost profits.  All Professional was instructed to follow the post-termination procedures, governed by section 16.4[7] of the franchise agreements, which required All

---

[6]   In a May 24, 2010, letter, Century 21 terminated the franchise agreement governing the Folsom office, which All Professional had closed. (Bertet Decl. in Supp. of Opp'n by Century 21 to Pls.' Mot. for P.I. ("Bertet Decl.") Ex. J (No. 2:10-2846, Docket No. 12).)  This termination is not at issue.

[7]   Section 16.4 requires, inter alia, (1) returning of Century 21's property, (2) discontinuing use of Century 21's Marks, (3) discontinuing use of signs or cross arm signposts displaying Century 21's logo, colors, color patterns and designs or Marks, (4) taking any affirmative action necessary to remove any use of Century 21's Marks, (5) "de-identifying" from Century 21 in a manner that does not confuse the public about the fact that they are no longer associated with Century 21, and (6) causing internet sites or web masters to removes Century 21's Marks from their web pages.

14

1   Professional to cease use of Century 21's trademarks.  Upon

2   termination of the franchise agreements, Century 21 denied All

3   Professional access to Century 21's server, e-mail, databases,

4   and the Preferred Client Club.  (Steve Wright Decl. II ¶ 14;

5   Carol Wright Decl. II ¶ 13; <u>see also</u> Steve Wright Decl. I ¶ 14;

6   Carol Wright Decl. I ¶ 14.)

7           In their declarations, the Wrights claim not to have

8   anticipated the terminations.  Carol Wright states that, based on

9   her communications with Rodriguez and Shawn Holland of Century

10  21:

11          I was lead [sic] to believe that we would receive an
            accounting of the actual amounts owed and that we would
12          be able to work out a payment plan.  I was ready to cure
            any default once we were provided with a proper
13          accounting.  I waited for this accounting.  However, I
            never received an accounting or an adjustment of the
14          amounts owed as I had requested.

15  (Carol Wright Decl. II ¶ 13; <u>see also</u> Carol Wright Decl. I ¶ 14.)

16  Steve Wright makes a similar statement about waiting for an

17  accounting.  (Steve Wright Decl. II ¶ 14; Steve Wright Decl. I ¶

18  14.)

19          However, the Wrights' testimony and Steve Wright's July

20  16, 2010, letter, requesting reinstatement show that the

21  terminations were not unanticipated. (Steve Wright Decl. II Ex.

22  3; <u>see also</u> Steve Wright Decl. I Ex. 3.)  The letter stated in

23  pertinent part:

24          It was never our intention not to pay Century 21 the
            royalty fees and NAF fees due.  The only part that was in
25          contention was the repayment of the Development Advance
            Note.  And it was that point that communications failed.
26          . . . We are open to discussion for an acceptable payment
            plan.

27

28  Century 21 subsequently denied the request for reinstatement in a

                                    15

1   letter dated July 29, 2010.  (<u>See</u> Steve Wright Decl. II Ex. 4;

2   <u>see also</u> Steve Wright Decl. I Ex. 4.)  In an August 2, 2010,

3   letter, the Wrights wrote that they were "perplexed" by the

4   denial of the request for reinstatement and were "curious as to

5   what this denial of [their] reinstatement was based on since our

6   message to Shelley was that we were willing to pay what was due

7   Century 21 and that we were willing to sign [Century 21's] note."

8   (Steve Wright Decl. II Ex. 5; <u>see also</u> Steve Wright Decl. I Ex.

9   5.)

10          The purpose of all of these discussions was essentially

11  to see if some kind of alternative payment plan could be worked

12  out between Century 21 and All Professional to relieve All

13  Professional of some of the financial hardship in which it found

14  itself.  All Professional had an obligation to pay the full

15  amount immediately.  Century 21 was not obligated by the

16  agreements or otherwise to enter into these discussions.  Century

17  21 may or may not have proposed a note, but there is no evidence

18  of the terms of a note.  There is only evidence of a discussion.

19  The Wrights' August 2, 2010, letter's reference to a message to

20  Rodriguez about a willingness to sign a note is too vague and

21  came only after Century 21 had terminated the agreements.  The

22  court cannot find any terms of an actual note or an e-mail or a

23  letter with terms to which they agreed.  Beyond the fact that

24  Century 21 did not need to agree to a note, to this day the court

25  cannot find what the terms would be of a note.  The sole reason

26  All Professional did not pay the franchise fees was simply that

27  it could not afford the fees.

28          In late August, Century 21 conducted inspections of the

1   Sacramento offices to determine whether All Professional had
2   complied with what it believed were All Professional's post-
3   termination obligations under the franchise agreements.  The
4   reports indicated that All Professional continued to use Century
5   21's trademarks.  (Iuliano Decl. I Exs. K-L; see also Miles Decl.
6   in Supp. Of Century 21's Mot. for P.I. against Defs. ("Miles
7   Decl.") ¶¶ 2-4, Exs. A-C (No. 2:10-2751, Docket No. 11).)  In a
8   September 17, 2010, letter, Century 21's counsel informed Steve
9   and Carol Wright of the results of the post-termination
10  inspections and demanded that they comply with the post-
11  termination franchise agreement obligations (Steve Wright Decl.
12  II Ex. 6; see also Steve Wright Decl. I Ex. 6), to which the
13  Wrights responded with a September 21, 2010, letter, proposing
14  terms under which All Professional would continue to be a
15  franchisee of Century 21.  (Steve Wright Decl. II Ex. 7; see also
16  Steve Wright Decl. I Ex. 7.)

17          On September 30, 2010, Steve Wright, Carol Wright, and
18  All Professional filed an action in state court against Century
19  21 for violation of a termination provision of the California
20  Franchise Relations Act ("CFRA"), Cal. Bus. & Prof. Code § 20020,
21  violation of California's Unfair Competition Law ("UCL"), Cal.
22  Bus. & Prof. Code §§ 17200-17210, intentional interference with
23  business advantage, breach of contract, breach of the implied
24  covenant of good faith and fair dealing, fraud, negligent
25  interference with business advantage, and interference with
26  contract.  (Notice of Removal Ex. A (No. 2:10-2846, Docket No.
27  1).)  On October 6, 2010, the state court denied Steve Wright,
28  Carol Wright, and All Professional's ex parte application for a

1   temporary restraining order.  (<u>Id.</u> Ex. J.)  With a pending motion

2   for a preliminary injunction against it, Century 21 removed the

3   action on October 21, 2010.

4            On October 12, 2010, Century 21 filed a separate action

5   in this court against All Professional, Steve Wright, and Carol

6   Wright for claims of federal trademark infringement, 15 U.S.C. §

7   1114, common law trademark infringement, federal unfair

8   competition, 14 U.S.C. § 1125, California statutory trademark

9   infringement, Cal. Bus. & Prof. Code § 14340, violation of the

10  UCL, breach of contract, breach of guaranty, breach of promissory

11  note, account stated, quantum meruit, and accounting.  (No. 2:10-

12  2751, Docket No. 1.)

13           On November 1, 2010, Century 21 filed the instant

14  motion for a preliminary injunction.  (No. 2:10-2751, Docket No.

15  8.)  Century 21 requests that the court enforce the post-

16  termination obligations under the franchise agreements, which

17  include All Professional's cessation of the use of Century 21's

18  trademarks.  On November 19, 2010, Steve Wright, Carol Wright,

19  and All Professional filed the instant motion for a preliminary

20  injunction against Century 21.  (No. 2:10-2846, Docket No. 9.)

21  They request that the court require Century 21 to restore All

22  Professional's benefits under the franchise agreements, including

23  access to Century 21's server, electronic mail, advertisement,

24  property listing services, prospecting databases and the

25  Preferred Client Club, and to enjoin Century 21 from denying All

26  Professional the right to use Century 21's trademarks.

27  II.  <u>Discussion</u>

28           In the Ninth Circuit, "'serious questions going to the

18

merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 622 F.3d 1045, 1053 (9th Cir. 2010).[8]

A.   Merits

The merits of Century 21's claims depend in part on whether Century 21 properly terminated the franchise agreements. See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1308 (11th Cir. 1998) ("[W]e find that the Lanham Act's requirement that a franchisor demonstrate that unauthorized trademark use occurred to prevail on the merits of a trademark infringement claim against a franchisee necessitates some type of showing that the franchisor properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the unauthorized use of trademarks by the former franchisee."); S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir. 1992) ("Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act.  Thus, Jiffy Lube will merit preliminary injunctive relief if it can adduce sufficient facts indicating that its termination of Durst's franchises was proper."); see also Re/Max N. Cent., Inc. v. Cook, 272 F.3d 424, 430 (7th Cir. 2001).  Termination of a franchise agreement may be improper under either the terms of the

---

[8]   To the extent a party seeks a mandatory injunction, "the district court should deny such relief unless the facts and law clearly favor the moving party." Stanley v. Univ. of So. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotation marks omitted).

19

1  agreement or state franchise laws.  See Re/Max N. Cent., 272 F.3d

2  at 430.

3         Section 16.2.3 of the agreements provided that Century

4  21 could terminate the agreement for good cause, which included

5  curable and non-curable defaults.  Section 16.2.4, governing

6  termination for curable defaults, provided that Century 21 could

7  terminate the agreement with 30 days notice of the "proposed

8  termination and the opportunity to cure the breach during the

9  entire notice period, or such longer or shorter notice as is

10 required or permitted by the law of the state where the Office is

11 located," if the curable breach was the failure to pay financial

12 obligations.

13        The CFRA, which the agreements incorporated by

14 reference, prohibits a franchisor from terminating a franchise

15 agreement absent good cause.  Cal. Bus. & Prof. Code § 20020.

16 Good cause includes failure to comply with the franchise

17 agreement "after being given notice thereof and a reasonable

18 opportunity, which in no event need be more than 30 days, to cure

19 the failure."  Id.  Immediate notice of termination without

20 opportunity to cure is permitted when the "franchisee fails to

21 pay any franchise fees or other amounts due to the franchisor or

22 its affiliate within five days after receiving written notice

23 that such fees are overdue."  Id. § 20021(j).

24        Here, it appears from the evidence that Century 21

25 properly terminated the franchise agreements under the terms of

26 the franchise agreements and the CFRA.  Century 21 notified All

27 Professional of its intent to terminate the franchise agreements

28 and the opportunity to cure in April 5, 2010, letters, following

20

1  prior informal notices of failure to pay amounts due that All
2  Professional had ignored.  Having not received payment of even
3  the undisputed fees, Century 21 terminated the Sacramento office
4  agreements effective July 9, 2010.

5        It was unequivocally clear from the testimony of the
6  Wrights that the only reason they did not pay the franchise fees
7  owed by them to Century 21 was that they did not have the money.
8  It was not because All Professional did not know the amount to
9  pay; nor was it because Century 21 had defaulted on its
10 obligations.  Considering the economy at that time, particularly
11 in the business of home sales, the court can sympathize with the
12 Wrights' predicament, but it was simply no excuse for their
13 failure to pay the fees lawfully owed to Century 21 under the
14 agreements.

15       The testimony was that over the period of the franchise
16 relationship, All Professional paid over $2 million in fees to
17 Century 21.  Considering that All Professional paid approximately
18 eight percent of its income in fees, this means that All
19 Professional made approximately $20 million in income over that
20 period.  The Wrights knew how important it was to be a Century 21
21 franchisee.  Each one testified to how crucial it was to be a
22 Century 21 dealer.  Just to use the trademarks was of
23 immeasurable value to them, but that was only part of the
24 benefit.  Century 21 also granted them access to Century 21's
25 server, e-mail, databases, and the Preferred Client Club.  All
26 Professional chose not to prioritize the amount it owed to
27 Century 21 to maintain that privilege.  When the Wrights elected
28 to pay their other debts ahead of the relatively small percentage

21

1  of their income it would have taken to maintain their Century 21

2  franchise, they made the decision that got them into this

3  situation.

4         Century 21's trademark and unfair competition claims

5  depend only in part on the proper termination of the franchise

6  agreements.  A federal claim for trademark infringement pursuant

7  to section 32 of the Lanham Act also requires (1) ownership of a

8  registered trademark; (2) use of that mark beginning before the

9  alleged infringer's use; (3) the alleged infringer's use without

10 the alleged owner's consent; and (4) that the alleged infringer's

11 use is likely to cause confusion, or to cause mistake, or to

12 deceive.  See 15 U.S.C. § 1114(a); Century 21 Real Estate v.

13 Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1998); Intel Corp. v.

14 Americas News Intel Pub., LLC, No. C 09-05085, 2010 WL 2740063,

15 at *2 (N.D. Cal. July 12, 2010).  The elements of a federal

16 unfair competition claim for false designation of origin of

17 services under section 43(a) of the Lanham Act is identical to

18 the federal trademark infringement claim, with the exception that

19 the trademark need not be registered.  See 15 U.S.C. § 1125(a);

20 Intel Corp., 2010 WL 2740063, at *2.

21        The same "ultimate test" governs both federal claims:

22 "whether the public is likely to be deceived or confused by the

23 similarity of the marks."  Century 21, 846 F.2d at 1178; see also

24 Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir.

25 2008).  The "confusion must be probable, not simply a

26 possibility."  Murray v. Cable Nat'l Broad. Co., 86 F.3d 858, 861

27 (9th Cir. 1996).  With respect to California law claims for

28 trademark infringement and unfair competition, courts apply the

22

same likelihood of confusion test applied to a federal trademark
infringement claim. <u>Levi Strauss & Co. v. Toyo Enterp. Co.</u>, 665
F. Supp. 2d 1084, 1096 (N.D. Cal. 2009) ("Accordingly, the
analysis set forth above under Plaintiff's federal trademark
infringement claim applies equally to Plaintiff's trademark and
unfair competition claims under California law."); <u>see also</u> <u>Jada
Toys, Inc.</u>, 518 F.3d at 632 (federal claims for trademark
infringement and unfair competition and UCL claim were subject to
the same test); <u>CytoSport, Inc. v. Vital Pharma., Inc.</u>, 617 F.
Supp. 2d 1051, 1066 n.1 (E.D. Cal. 2009) ("Likelihood of
confusion is also the test for trademark infringement and unfair
competition under California common and statutory law.").

The Ninth Circuit has established eight non-exhaustive
factors that are relevant to a likelihood-of-confusion
determination: (1) the strength of the alleged owner's trademark;
(2) proximity of the goods or services; (3) similarity of the
trademarks; (4) evidence of actual confusion; (5) marketing
channels used; (6) type of goods or services and the degree of
care likely to be used by the purchaser; (7) alleged infringer's
intent in selecting the mark; and (8) likelihood of expansion of
the product lines. <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341,
348-49 (9th Cir. 1979).

Here, the Wrights and All Professional have not argued
that All Professional's continued use of Century 21's trademarks
is not likely to cause confusion.  Nonetheless, the court will
apply the <u>Sleekcraft</u> factors.  On the similarity factor, All
Professional has undisputably continued to use Century 21's
trademarks.  All Professional has not altered them.  <u>See, e.g.</u>,

1  <u>Century 21</u>, 846 F.2d at 1179 (former franchisee argued against

2  likelihood of confusion when it omitted "21" from name).   The

3  court also finds that Century 21's trademarks are strong. (<u>See</u>

4  Iuliano Decl. I ¶ 6).   In <u>Century 21 Real Estate Corp.</u>, 846 F.2d

5  at 1179, the Ninth Circuit found Century 21's trademarks strong

6  on the facts of that case based in part on the money spent on

7  advertisements containing the trademarks and the revenue

8  generated by use of the trademarks.   <u>Id.</u>

9          While the court has not been presented with actual

10  evidence of confusion, the Wrights' declarations and testimony

11  suggest that All Professional desires to use Century 21's

12  trademarks to attract listings and qualified agents. (Steve

13  Wright Decl. I ¶ 17; Carol Wright Decl. I ¶ 17.)   All

14  Professional uses Century 21's trademarks in connection with real

15  estate brokerage services, the same services offered by Century

16  21's franchisees.   (Iuliano Decl. I ¶¶ 5, 21-22, Exs. K-L; Miles

17  Decl. ¶¶ 2-4, Exs. A-C.)   Lastly, like Century 21 franchisees,

18  All Professional markets its services through signs, business

19  cards, and the internet. (Iuliano Decl. I ¶¶ 4-6, 21-22, Exs. K-

20  L; Miles Decl. ¶¶ 2-4, Exs. A-C.)   Accordingly, the court finds a

21  likelihood of confusion based on the <u>Sleekcraft</u> factors.   Because

22  it appears from the evidence that Century 21 properly terminated

23  the franchise agreements and that All Professional's continued

24  use of Century 21's trademarks will likely confuse the public,

25  the court finds that it is likely that Century 21 will succeed on

26  its federal and state trademark infringement and unfair

27  competition claims.

28          However, the court does not find the evidence

24

1  sufficient to support an injunction against Century 21 based on

2  All Professional's claims for violation of a termination

3  provision of the CFRA, violation of the UCL, intentional

4  interference with business advantage, breach of contract, breach

5  of the implied covenant of good faith and fair dealing, fraud,

6  negligent interference with business advantage, and interference

7  with contract.

8          B.  <u>Irreparable Harm</u>

9              1.  <u>Century 21</u>

10         Before <u>Winter v. Natural Resources Defense Council,</u>

11 <u>Inc.</u>, 555 U.S. 7 (2008), and <u>eBay Inc. v. MercExchange, L.L.C.</u>,

12 547 U.S. 388, 393-94 (2006) (concluding that district courts must

13 apply traditional principles of equity, including assessing the

14 likelihood of irreparable harm, when granting a permanent

15 injunction in the context of patent infringement), courts applied

16 a presumption of irreparable harm upon a showing of a likelihood

17 of success on the merits in intellectual property infringement

18 cases.[9]  <u>See</u> <u>El Pollo Loco, Inc. v. Hashim</u>, 316 F.3d 1032, 1038

19 (9th Cir. 2003) (trademark infringement case); <u>GoTo.Com, Inc. v.</u>

20 <u>Walt Disney Co.</u>, 202 F.3d 1199, 1205 n.4 (9th Cir. 2000) (same).

21 Subsequent to and in light of <u>Winter</u> and <u>eBay</u>, some courts

22 declined to apply the presumption.  <u>See, e.g.</u>, <u>CytoSport</u>, 617 F.

23 Supp. 2d at 1065 (trademark and trade dress infringement case);

24

25         [9]   In the trademark infringement context, the reason for
26 the presumption "is that once a probability of proving likelihood
   of confusion at trial is shown, the trademark owner's business
27 goodwill and reputation are at risk."  <u>Volkswagen AG v. Verdier</u>
   <u>Microbus and Camper, Inc.</u>, No. C 09-00231, 2009 WL 928130, at *6
28 (N.D. Cal. 2009).

1  <u>Volkswagen AG v. Verdier Microbus and Camper, Inc.</u>, No. C
2  09-00231, 2009 WL 928130, at *6 (N.D. Cal. 2009).

3          In <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH &</u>
4  <u>Co.</u>, 571 F.3d 873, 877 (9th Cir. 2009), the Ninth Circuit upheld
5  a district court's application of the presumption in a trademark
6  infringement case.  <u>Id.</u> ("Because the court found a likelihood of
7  success on the merits, it reasonably presumed irreparable injury
8  . . . ."); <u>see also</u> <u>TMX Funding, Inc. v. Impero Techns., Inc.</u>,
9  No. C 10-00202, 2010 WL 2745484, at *7 (N.D. Cal. July 9, 2010)
10 (describing <u>Marlyn</u> as reaffirming the presumption in trademark
11 infringement cases); <u>Protectmarriage.com v. Courage Campaign</u>, 680
12 F. Supp. 2d 1225, 1228 (E.D. Cal. 2010) (explaining in dicta that
13 the presumption applies to trademark infringement cases).  <u>But</u>
14 <u>see</u> <u>Aurora World, Inc. v. Ty Inc.</u>, 719 F. Supp. 2d 1115, 1169
15 (C.D. Cal. 2009) ("The <u>Marlyn</u> court appeared to apply <u>Winter</u> and
16 did not consider the impact of the Supreme Court's decision in
17 <u>eBay</u>.") (copyright infringement case); <u>see also</u> <u>Credit Bureau</u>
18 <u>Connection, Inc. v. Pardini</u>, --- F. Supp. 2d ----, ----, 2010 WL
19 2737128, at *14 (E.D. Cal. July 12, 2010) (finding irreparable
20 harm in a copyright infringement case but citing <u>eBay</u> and
21 declining to presume irreparable harm).
22          In light of the foregoing, the viability of the
23 presumption of irreparable harm caused by trademark infringement
24 is at best still an open question.  Regardless of whether the
25 presumption still applies, in this case it is clear that Century
26 21 will suffer irreparable harm if All Professional is not
27 enjoined from using its trademarks.  While "economic injury alone
28 does not support a finding of irreparable harm, because such

1   injury can be remedied by a damage award," <u>Rent-A-Center, Inc. v.</u>
2   <u>Canyon Television & Appliance Rental, Inc.</u>, 944 F.2d 597, 603
3   (9th Cir. 1991), the Ninth Circuit has recognized that damage to
4   goodwill is an irreparable harm.   <u>Id.</u>   Business goodwill includes
5   a company's reputation.   <u>See</u> <u>WMX Techs. v. Miller</u>, 80 F.3d 1315,
6   1325 (9th Cir. 1996).

7          It appears obvious from the testimony of Steve Wright
8   and the e-mails and other communications exchanged between the
9   parties (<u>see, e.g.</u>, Suppl. Steve Wright Decl. Ex. 12), that
10  Century 21 and All Professional, under the ownership of Steve and
11  Carol Wright, will never be able to resume a relationship of
12  mutual trust and respect.   It is clear to the court that the
13  relationship between the parties has irreparably broken down.
14  For example, on May 13, 2009, Steve Wright went so far as to
15  threaten Century 21 with an action for fraud if Century 21 did
16  not compromise regarding the debt on the Note.   Under the
17  circumstances, to allow All Professional to hold itself out to
18  potential buyers and sellers of real estate as the agent or
19  representative of Century 21 would be only to invite injury to
20  Century 21's good will and reputation.

21         In <u>CytoSport</u>, 617 F. Supp. 2d at 1080, Judge Damrell
22  pointed out that:

23         Trademarks serve as the identity of their owners and in
           them resides the reputation and goodwill of their
24         owners.   Thus, if another person infringes the marks,
           that person borrows the owner's reputation, whose
25         quality no longer lies within the owner's control.   A
           trademark owner's loss of the ability to control its
26         marks, thus, creates the potential for damage to its
           reputation. [citing <u>Opticians Ass'n of Am. V. Indep.</u>
27         <u>Opticians of Am.</u>, 920 F.2d 187, 196 (3rd Cir. 1990).]

28

                                  27

1                    2.   <u>Wrights & All Professional</u>

2              It is also clear to the court that the Wrights and All

3    Professional will likely suffer irreparable injury if they are

4    enjoined from using Century 21's trademarks.  The evidence shows

5    that All Professional has already suffered economic damages by

6    its being denied access to Century 21's System. (Steve Wright

7    II ¶¶ 17-19; Carol Wright II ¶¶ 17-19; Suppl. Steve Wright Decl.

8    ¶ 7.)  It is likely that denying All Professional the right to

9    use Century 21's trademarks would increase the economic harm.

10   Primarily, the System and trademarks attract listings and

11   qualified agents who generate revenue.

12             However, mere monetary harm is not irreparable harm.

13   <u>Rent-A-Center, Inc.</u>, 944 F.2d at 603; <u>Am. Trucking Ass'ns v.</u>

14   <u>City of L.A.</u>, 559 F.3d 1046, 1057 (9th Cir. 2009); <u>see also</u>

15   <u>Dunkin' Donuts Franchised Restaurants LLC v. KEV Enterps., Inc.</u>,

16   634 F. Supp. 2d 1324, 1336 (M.D. Fla. 2009) ("While the Court

17   recognizes that Defendants will sustain financial losses if a

18   preliminary injunction issues, that harm is the result of

19   Defendants' failure to comply with the requirements of the

20   Franchise Agreements.  Weighing Defendants' self-inflicted

21   injury against Plaintiffs' immeasurable losses to its

22   hard-earned goodwill, the Court finds the balance of harms

23   weighs decisively in favor of granting the requested relief.").

24             Nonetheless, intangible injuries that are incapable of

25   measurement, like reputation, recruiting efforts, and goodwill,

26   may constitute irreparable harm.  <u>Rent-A-Center, Inc.</u>, Inc., 944

27   F.2d at 603.  Century 21's System and trademarks attract

28   qualified agents and All Professional considers Century 21's

                                 28

trademarks to be essential to its name "Century 21 All
Professional." (See Suppl. Steve Wright Decl. ¶¶ 2-4; Steve
Wright Decl. II ¶ 17-18; Steve Wright Decl. I ¶¶ 17-19.)  Thus,
whatever the court decides on the pending motions will likely
result in irreparable harm to one side in this dispute.

      C.   Balance of Equities and Public Interest

      A court looks to the balance of equities and the
public interest in deciding whether to issue an injunction.
Maxim Integrated Prods., Inc. v. Quintana, 654 F. Supp.2d 1024,
1035-26 (N.D. Cal. 2009).  While the court cannot quantify the
irreparable harm that will befall each party in this action, the
court finds that the public interest weighs heavily in favor of
issuing an injunction in favor of Century 21.  In the trademark
context, the public interest is usually the right of the public
not to be deceived or confused.  See Internet Specialties West,
Inc. v. Milon-DiGiorgio Enters., Inc., 559 F.3d 985, 993-94 (9th
Cir. 2009); see e.g., CytoSport, 617 F. Supp. 2d at 1080;
Moroccanoil, Inc. v. Moroccan Gold, LLC, 590 F. Supp. 2d 1271,
1282 (C.D. Cal. 2008).

      All Professional's continued use of the trademarks
will not only falsely represent to the public that All
Professional is a Century 21 broker in the good graces of its
franchisor, but will also deceive the public into believing that
All Professional enjoys all the tools, resources, and systems
normally provided by Century 21 to its franchisees.  Preventing
such deception is strongly in the public interest.

      Accordingly, the court will grant Century 21's motion
for a preliminary injunction and deny the Wrights' and All

29

1  Professional's motion for a preliminary injunction.

2         Century 21 has requested that the court enforce All

3  Professional's post-termination obligations under the

4  agreements, which exceed cessation of the use of Century 21's

5  trademarks.  Such an injunction would not be necessary to

6  preserve the status quo in this case, and the court accordingly

7  will not order such relief in this preliminary injunction.  The

8  court will only enjoin the Wrights and All Professional from

9  further unauthorized use of Century 21's Marks, as defined under

10  the franchise agreements.  Such injunction should be sufficient

11  to ensure that the public does not mistakenly believe that All

12  Professional is a Century 21 franchisee.

13         D.    Bond

14         Rule 65(c) of the Federal Rules of Civil Procedure

15  provides that:

16         The court may issue a preliminary injunction . . . only
           if the movant gives security in an amount that the
17         court considers proper to pay the costs and damages
           sustained by any party found to have been wrongfully
18         enjoined or restrained.

19

20  The parties have not addressed the amount of bond to be posted.

21  From the record presently before the court it is impossible to

22  quantify the damages All Professional may sustain as a result of

23  this injunction.  From the testimony, however, it appears that

24  they are likely to be substantial.  The court considers a bond

25  in the sum of $100,000 to be appropriate under the

26  circumstances.

27         IT IS THEREFORE ORDERED that:

28         (1) Steve Wright, Carol Wright, and All Professional's

30

1 | motion for a preliminary injunction be, and the same hereby is,
2 | DENIED; and
3 |        (2) Century 21's motion for a preliminary injunction
4 | be, and the same hereby is, GRANTED.  Pending final hearing on
5 | the merits of the parties' claims, or until otherwise ordered by
6 | this court, Steve Wright, Carol Wright, and All Professional are
7 | HEREBY ENJOINED from further unauthorized use of Century 21's
8 | Marks, as defined in the franchise agreements.  This preliminary
9 | injunction shall become effective upon the posting by Century 21
10 | of valid security in the amount of $100,000.
11 |        IT IS SO ORDERED.
12 | DATED:  January 21, 2011

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE