IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---o0o---

CENTURY 21 REAL ESTATE LLC,
a Delaware Limited Liability
Company formerly known as
Century 21 Real Estate
Corporation,
                    Plaintiff,
vs.                                      No. Civ. S-10-2751
                                         Civ. S-10-2846
                                         Civ. S-11-2497
ALL PROFESSIONAL REALTY, INC.,
a California corporation doing
business as CENTURY 21 ALL
PROFESSIONAL; STEVEN M. WRIGHT,
an individual; and CAROL
WRIGHT, an individual,

                    Defendants.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

MONDAY, JULY 30, 2012

---o0o---

Reported by:   KATHY L. SWINHART, CSR #10150

1                            APPEARANCES

2

    For Century 21 Real Estate LLC:

3
            GORDON & REES
4           633 West Fifth Street, Suite 4900
            Los Angeles, California  90071
5           BY:     AARON PAUL RUDIN
            and     LISA K. GARNER
6           and     CALVIN DAVIS

7
    For Steven Wright, Carol Wright and All Professional
8   Realty, Inc.:

9           GOODMAN & ASSOCIATES
            3840 Watt Avenue, Building A
10          Sacramento, California  95821
            BY:     KAREN M. GOODMAN
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SACRAMENTO, CALIFORNIA

MONDAY, JULY 30, 2012, 5:00 P.M.

---o0o---

THE CLERK:  Item six, civil S-10-2751 and civil

S-10-2846 and civil S-11-2497, Century 21 Real Estate, LLC,

versus All Professional Realty, Incorporated, et al., and the

related cases.

Counsel, your appearances, please.

MS. GARNER:  Good afternoon, Your Honor.  Lisa Garner

on behalf of plaintiff Century 21 Real Estate, LLC.

MS. GOODMAN:  Good afternoon, Your Honor.  Karen

Goodman on behalf of Steve Wright, Carol Wright and All

Professional Realty.

MR. RUDIN:  Good afternoon, Your Honor.  Aaron Rudin

also on behalf of plaintiff Century 21 Real Estate, LLC.

MR. DAVIS:  Good afternoon, Your Honor.  Calvin Davis

for plaintiff Century 21, LLC.

THE COURT:  All right.  Ms. Garner, are you going to

be speaking primarily?

MS. GARNER:  Your Honor, Mr. Rudin and I have divided

up the issues, so we'll speak accordingly.

THE COURT:  Tell me how they're divided so I know what

to ask you.

MS. GARNER:  Century 21 claims will be argued by Mr.

Rudin, and any claim of the defendant will be argued by

1    myself.

2            THE COURT:  Maybe it's late in the day.

3            MS. GOODMAN:  Very late.

4            MS. GARNER:  Yes, Your Honor.

5            THE COURT:  You said that Mr. Rudin -- you're going to

6    argue Century 21's arguments?

7            MS. GARNER:  Your Honor, Century 21 has made a motion

8    for summary adjudication --

9            THE COURT:  Right.

10           MS. GARNER:  -- on some of the claims in its

11   complaint.  Mr. Rudin will argue those issues.

12           Century 21 has also made a motion for summary

13   adjudication as to each and every cause of action in the

14   defendants' case --

15           THE COURT:  Mr. Rudin is going to argue the damages

16   issues.

17           MS. GARNER:  The breach of contract --

18           THE COURT:  Okay.  I understand.

19           MS. GARNER:  -- the trademark infringement and the

20   guarantee issues.  Yes, Your Honor.

21           THE COURT:  All right.  Ms. Garner, you proceed first

22   then.

23           MS. GARNER:  Your Honor, we have submitted in our

24   moving papers and in our reply all of our arguments.  Unless

25   Your Honor has questions, we submit.

1          THE COURT:  I appreciate that.  Let me just look

2     through this because I don't want to, just because it's late,

3     miss an issue that you might have helped me on.

4          I have in my notes that, on the fraud claim, in

5     responses to interrogatories, All Professional identified 11

6     separate representations that it would rely upon for its fraud

7     claim.  In your motion, you addressed all 11 claims.  I guess

8     this question is probably then for Ms. Goodman.

9          Is it your understanding that All Professional is

10    still urging those 11 representations or that it has reduced

11    its claims?  Do you have any understanding on that?

12         MS. GOODMAN:  If it's addressed to me, which I will

13    answer the question because I don't expect Ms. Garner to read

14    my mind, we focused on I think the two affirmative

15    representations that we think support the fraud claim.  So

16    we're not proceeding on the other representations as it

17    relates to the fraud claim.

18         THE COURT:  Okay.

19         All right.  I guess on the issue then that you are

20    going to address, Ms. Garner, I don't have any questions.

21         MS. GARNER:  Thank you, Your Honor.

22         THE COURT:  Mr. Rudin, why don't you proceed then,

23    because I did want to ask you some questions.

24         MR. RUDIN:  Well, I think I would take the similar

25    approach as Ms. Garner as well.  We tried to put everything in

1    the papers.  But if there are specific issues that I can

2    address, I would be more than happy to comment on just those

3    as opposed to going through all of the issues.

4              THE COURT:  Well, on the damage claims -- these are

5    all just words right now.  Let me talk to my law clerk a

6    minute.

7              (Off-the-record discussion with law clerk.)

8              THE COURT:  You've submitted a number of claims.

9    Among those that All Professional objects to, it claims that

10   it was overcharged by $1,359 in advertising fees that were

11   first charged in January of 2007 and previously waived by

12   Century 21 as an erroneous charge.  And then I didn't see what

13   your response to that was.

14             And the other one, there was another argument that

15   they were charged $1,500 for a lead router to the River Park

16   franchise account, and Mr. Wright said he never agreed to pay

17   for that router.  And I didn't see what your response was to

18   that one, either.

19             MR. RUDIN:  Yes, I believe we did address it as to the

20   fact that these were sort of conclusory statements that have

21   no evidentiary support behind them.

22             In regards to the first issue, which was this single

23   charge of $1,359, there was sort of this claim that it had

24   been somehow waived by Century 21.  Essentially we don't

25   believe that there's any evidence at all in the record to

1    suggest that there was a waiver of that particular charge.

2           I believe they submitted a series of e-mails in which

3    there was some sort of discussion about charges being waived

4    in exchange for basically a signature on -- or an extension on

5    the franchise agreements.  These were sort of issues that had

6    come up in terms of the DAN note.  And one of -- one of the

7    options that had been discussed by the parties was whether or

8    not they could extend the franchise agreement and, in

9    exchange, waive certain charges.

10          That was never reached, that agreement was never

11   reached.  And when you look at this series of e-mails, there's

12   really nothing to suggest that there was an affirmative waiver

13   of this particular January 2007 charge.  There's just sort of

14   vague language.

15          So there's nothing in the record right now, no

16   admissible evidence that would go towards that particular

17   theory that they have, that that charge was somehow waived by

18   Century 21.

19          And then we have a similar evidentiary issue as well

20   in terms of this lead router services which defendants

21   indicate they never agreed to pay, yet they did receive and

22   there's -- there's no argument, well, we didn't receive lead

23   router services, we did get those.  So they've taken the

24   benefit of the service, and it's their position at this point

25   apparently that they didn't have any obligation to pay.

1          But I don't know where that comes from, either, other

2    than sort of a conclusory remark in the declaration --

3          THE COURT:  What's a lead router?

4          MR. RUDIN:  It's a service that's provided by Century

5    21 in which leads -- I guess you could say that there's a

6    property or someone expresses an interest in a real estate

7    property, that lead could then be routed to somebody that

8    could handle it.  So if the lead comes up maybe in another

9    state, perhaps it could be routed to somebody that's close to

10   that --

11         THE COURT:  So is the $1,500 charge for routing one

12   lead?

13         MR. RUDIN:  No, it would be for the service.  I

14   believe that would be a year's --

15         THE COURT:  And it's a monthly service?  What is it?

16         MR. RUDIN:  A year's worth of service for that.

17         THE COURT:  And is that in the written agreement

18   somewhere?

19         MR. RUDIN:  In the written --

20         THE COURT:  Any of the written agreements.

21         MR. RUDIN:  I don't know if there is a specific

22   provision in the written agreement saying that the lead router

23   service will be $1,500, yearly service.  I think that's just

24   something that the parties received and that --

25         THE COURT:  Is there --

1        MR. RUDIN:  There are a number of services like this,

2    though, that Century 21 essentially offers to its members.

3        THE COURT:  Is there a reference in any of the

4    agreements to the lead router service?

5        MR. RUDIN:  I would -- I would have to go through and

6    see if there's a specific reference.  I know that there's

7    broad references to the various services that are offered

8    by --

9        THE COURT:  I mean, she just says that the defendant

10   never agreed to pay this.  And so if you're going to overcome

11   that, you need to point to something that says they did agree

12   to pay it.  Either it's in the contract or someplace.

13       MR. RUDIN:  Okay.  But I do know that there was

14   evidence that they -- that they received it.  There was

15   testimony during the evidentiary hearing before this court

16   regarding that being one of the more important services that

17   they did in fact receive and a benefit to them.

18       But I don't know if there's a -- if there's something

19   specific I can point to within the document itself that would

20   say a $1,500 charge for lead router services is what Century

21   21 is going to be charging the defendants in this case.  I

22   think it's just a service that they would receive each year.

23       They didn't make -- there's nothing to indicate that

24   they made any effort to opt out of the receipt of it.  They

25   certainly took the benefits of it.  And during the evidentiary

1    hearing, they kind of indicated that was one of the key things

2    that they did receive, one of the things that was beneficial

3    to them.

4          THE COURT:  All right.  Now I would like you to

5    address your future lost profits argument and the liquidated

6    damages clause.

7          MR. RUDIN:  Okay.  Each of the franchise agreements

8    has in it a provision that applies in the event that there is

9    a breach and a termination, an early termination, which we

10    believe we've established in this case, that it would be

11    difficult to ascertain what the lost profits were on Century

12    21's end.

13          The reason it's difficult to ascertain is because

14    these lost profits are based on their monthly gross revenues,

15    and you can't really foresee exactly what that number would

16    be.  So --

17          THE COURT:  Well, but unlike a lot of other fact

18    situations, when they leave, there's somebody else.  You have

19    other -- you have other franchises.

20          MR. RUDIN:  Century 21 has numerous franchises, that's

21    correct, but that doesn't impact the lost profits they

22    received from this particular franchise.

23          Century 21 may have 30 franchises located in

24    Sacramento, and I don't know the number.  But the fact that

25    one breaches its agreement and gets terminated doesn't affect

1   or impact Century 21's lost future profits it would receive

2   from that particular franchise.

3            It's not like suddenly, because it has 29 others still

4   there, it's all made up for from the other 29 because all of

5   the business that it would have -- that that franchise that

6   was terminated generated has suddenly been allocated to these

7   others.  It doesn't work like that.  Especially if they're

8   still operating, and they're still making sales.  We're just

9   not receiving any -- any profits from those sales.

10           So that would not be made up from -- by the fact that

11  there's additional Century 21 offices.

12           And this provision is sort of designed to say, well,

13  we've been harmed here, there's a breach, an early

14  termination, and here is the best we can do in terms of

15  calculating how much should be imposed in terms of liquidated

16  damages for these offices that are no longer reporting their

17  transactions to Century 21.

18           THE COURT:  Well, the defendant presents an e-mail in

19  which it is suggested that Century 21 didn't expect to suffer

20  any losses if the franchise was terminated.

21           And I'm referring to this e-mail of July 12th, 2010,

22  in which Bainbridge said:  I believe, if we terminate, we

23  could get most of the producing agents who are loyal to C-21.

24           MR. RUDIN:  I believe that may have been their hopes

25  at that time.  And I know there is evidence as to at least one

1  of the offices, that's the Folsom office in particular, and so

2  there is some evidence I guess before the Court indicating

3  that that's what they hope.  I don't know that that adds up to

4  one thing or another in terms of whether or not they were

5  actually able to recoup all of the lost profits they lost from

6  that -- from having that office.

7         And even so, at best, that would just be one of the

8  four, that would just be as to the second franchise agreement.

9  There's no -- there's nothing before the Court suggesting that

10  Century 21 felt that the first office -- the first and third

11  offices, which were both located in Sacramento and are still

12  operating, that Century 21 felt that it would recoup all of

13  its losses from those, or the Hawaii office.

14         THE COURT:  What rational relationship is there

15  between the amount of the liquidated damages as provided in

16  the contract and what you might actually anticipate the

17  damages to be?

18         MR. RUDIN:  Well, I think they were pretty creative in

19  that, and I think they did the best job they could do.  And

20  what they do is they take the amounts of the royalties that

21  they've received over the course that the franchise was

22  active, and they come up with sort of what's the average

23  amount over that period of time.  Then they ascertain, well,

24  how much is remaining on the life of this franchise agreement?

25         Okay.  Well, this is the average we received while

1    they were active, so we'll use that sum to ascertain what

2    would be received should this relationship have continued to

3    fruition.

4         And --

5         THE COURT:  I know, but that assumes that all of the

6    business that All Professional was getting when it was

7    affiliated with Century 21 goes someplace other than a Century

8    21 franchise.  And there's evidence from this e-mail and just

9    from the evidence we heard in the case that there are other

10   Century 21 franchises that are able to pick up the slack when

11   one is either disbanded or leaves.

12        MR. RUDIN:  Well, yes, I think there's -- there's

13   minimal evidence in the record with the one that's disbanded,

14   and that's the -- what we were just talking about in terms of

15   the e-mail exchange with Mike Bainbridge.  But there's no

16   evidence as to whether or not they'd be able to pick up the

17   slack from the others which, as far as the evidence before

18   this court would indicate, are still operating fully.

19        I mean --

20        THE COURT:  That's a good point.  If they're still

21   operating fully, that would make more sense.

22        MR. RUDIN:  And that's really -- I mean, this isn't --

23   it can't be an exact science here because we don't -- we don't

24   know.  We can't go in and figure out exactly what their sales

25   were when we were negotiating this agreement.  We're just

1   trying to come up with what a reasonable assessment would be.

2           And I think that's really the test under New Jersey

3   law is, you know, is this reasonable?  I believe it is, it's

4   very reasonable.  They use the best formula they can come up

5   with --

6           THE COURT:  Well, at least with regard to the one that

7   was disbanded.  Under New Jersey law, it's unreasonable if it

8   does more than compensate the plaintiffs for their approximate

9   actual damages caused by the breach.  And for that one that

10  was disbanded, it probably does more.

11          MR. RUDIN:  That would certainly be the argument

12  that -- or at least the defendants' position.  I don't know

13  that there's enough evidence one way or another, but that's

14  certainly their position as to the disbanded office, and

15  that's what they've put forth.

16          As to the others, there's no evidence at all to

17  suggest that the amounts being charged would be unreasonable.

18          THE COURT:  I think those were the only questions I

19  had for you.  Let me just take one more look before I ask Ms.

20  Goodman to respond.  And she can say anything she wishes to

21  say with regard to the other issues as well.

22          All right.  Ms. Goodman.

23          MS. GOODMAN:  Thank you.  Your Honor, would you like

24  me up there or just sitting here?

25          THE COURT:  Yes, it's easier for the Reporter.  It's

 1  been a long day.

 2          MS. GOODMAN:  Okay.  It has been.

 3          So if I can just address the question that you had

 4  just now about liquidated damages.

 5          Whether you apply New Jersey law or California law,

 6  this is a situation where it's unreasonable, and I think

 7  constitutes --

 8          THE COURT:  How about with regard to the two

 9  franchises that still exist?

10          MS. GOODMAN:  Well, what's --

11          THE COURT:  The argument is that that's reasonable

12  because they're still there, and we have no reason to believe

13  that they're not doing as well or maybe even better than they

14  were when they were affiliated with Century 21.

15          MS. GOODMAN:  Well, of course, they are not branded,

16  they're not associated with any brand.  There's no evidence to

17  that.  So the idea they're performing at the same -- with the

18  same services they had when they were with the national brand

19  is certainly not true.

20          The second part with that is -- and the Sealy case,

21  which is a California case, points this out -- is the idea

22  that it was Century 21 that made the decision to terminate

23  this franchise where the clients did not intend to be

24  terminated.  They had a 15-year relationship.  They were

25  vested.  They had invested $2 million worth of fees that

1    they'd already paid to Century 21 during the lifetime of the

2    franchise.

3        So when you're evaluating liquidated damages and

4    trying to determine whether it's a penalty, which this is,

5    versus liquidated damages, it has to bear some reasonable

6    relationship to the injuries that the franchisor was likely to

7    have suffered, and there's no basis for that.

8        What they've done is they've said, regardless of when

9    we terminate in the 10-year period, we will take the average

10   of what we received during the time that they were in

11   existence and then carry that out for the duration.

12       So the facts in this case, we know that Century 21

13   Select is already operating in Folsom.  There are not

14   territories that preclude other Century 21 franchises from

15   actually operating.  And we have the testimony --

16       THE COURT:  Could I break --

17       MS. GOODMAN:  Yes.

18       THE COURT:  -- it down, and could I apply the

19   liquidated damages to the two franchises that are still in

20   existence but not as to the Folsom franchise?

21       MS. GOODMAN:  I think that you could break it down if

22   they limit it with time and duration, which they did not do,

23   and limit it to some sort of scope.

24       So they basically -- this is in the middle of the five

25   years.  So they've done -- and it isn't as if you have four

1    months or five months, the time that it would take to get up

2    to speed and backfill if that's the claim.  But that's not.

3           What they've said basically is, we're going to carry

4    that out for an additional five years assuming that everything

5    would have been the same as it was in the first five years.

6           And when you have a case like this -- and the New

7    Jersey case that actually they cited was very good on this

8    point, because it -- Central Steel Drum Company versus Gold

9    Cooperage, a 1985 case, 200 N.J.Sup. 251 -- defined a

10   liquidated damage provision as being a penalty when it's

11   unreasonable, unconscionable and the product of gross unequal

12   bargaining power.

13          And in this case, given how the breadth of this is,

14   this kind of categorical, as counsel says, creative way of

15   basically sticking it to the franchisees, this certainly does

16   not constitute a reasonable measure of damages they've

17   suffered.

18          You can't overlook, as it relates to a summary

19   judgment, the admissions by the business consultant at the

20   time.  And I know it's --

21          THE COURT:  Well, I really don't think that it's

22   sticking it to the franchisee.  Because in a situation, not

23   this situation, but in another situation where the franchisee

24   just elected to go out on their own because they thought they

25   could do a lot better with some other affiliation, they'd be

1   limited to their liquidated damages which might well be less

2   than the actual damages.

3           MS. GOODMAN:  Well, I think that's the legitimate

4   purpose, is to --

5           THE COURT:  Well, I mean, it's not sticking -- if it's

6   a boilerplate that they put in a contract, I don't think it

7   sticks it to the franchisee.

8           If I could break this down, I would consider doing

9   that.

10          MS. GOODMAN:  But --

11          THE COURT:  In other words, if I could not apply the

12  liquidated damages to the Folsom franchise and still apply it

13  to the others, I'd consider that.

14          MS. GOODMAN:  I mean, I hear you.  I don't think the

15  law in California or New Jersey supports that application for

16  any liquidated damages as defined by the contract drafted by

17  Century 21.

18          THE COURT:  You may be right.  Because it's either

19  liquidated or it's not liquidated.  You can't make it

20  liquidated in part and unliquidated and actual damages in

21  other parts.

22          MS. GOODMAN:  I could see hypothetically, and I'm not

23  here to re-draft the contract, a limited ramp-up time.  Say

24  you're going to pay a five-month penalty.  But that's not what

25  they did.  They take it arbitrarily till the end of the

1     contract, and that's five years in this case.

2              That's in this case --

3              THE COURT:  I don't see that as a problem.

4              Let me go back to what I said.  These are three

5     separate contracts, aren't they?

6              MS. GOODMAN:  They're three separate contracts.

7              THE COURT:  So I could enforce the liquidated damages

8     on one and not on another.

9              MS. GOODMAN:  But the problem with doing that is you

10    have to look at is there some reasonable approximation of

11    damages?  And you have, just as you were saying this,

12    admissions by the business consultant, at the time that

13    they're considering --

14             THE COURT:  Yeah, with regard to Folsom.

15             MS. GOODMAN:  No, no, no.  Folsom was already done.

16    That was -- and you may have been confused by that.  Folsom

17    was done.

18             The sequence was, Dan Jacuzzi went in in February of

19    2010 and said I want the Folsom office.  The only way I want

20    it, though, is I want to make sure that the Wrights are out of

21    the system.  They proceed to approve that franchise in May of

22    2010.  They send the termination letter to my clients at that

23    time.  So that was done before the cutting off of services in

24    July of 2010.

25             In July of 2010, when Century 21 cut off the services

1  without warning and in the middle of negotiations on the deal

2  point agreement that they were promised, Mike Bainbridge, the

3  business consultant, in internal discussions that we received

4  said don't worry about it, we'll make it up.  We've got the

5  productivity from our other agents.

6           THE COURT:  Don't worry about what?

7           MS. GOODMAN:  Don't worry about the loss of business.

8           Because internally, which --

9           THE COURT:  From Hawaii and --

10          MS. GOODMAN:  No, the overall cutting off a company

11  that has paid $2 million over the course --

12          THE COURT:  Was he talking about other franchises

13  besides Folsom?

14          MS. GOODMAN:  He wasn't even talking about Folsom.

15          Because my point of that --

16          THE COURT:  Was he talking about Hawaii and the

17  other --

18          MS. GOODMAN:  Yes.

19          THE COURT:  Okay.  Okay.

20          MS. GOODMAN:  Because, remember, Your Honor -- and I

21  know it's late -- Folsom was already terminated --

22          THE COURT:  Okay.

23          MS. GOODMAN:  -- two months before.

24          The business consultant, in allaying the concerns of

25  other people internally at Century 21, says don't worry about

1  it, we'll more than make it up.  We have -- we'll get the

2  agents.  We'll be able to bring other people into the system.

3        So this isn't a case of a reasonable approximation of

4  damages or losses.  Century 21 did not reasonably anticipate

5  any losses.  This is a classic case of a penalty, and it was

6  designed for the purpose of the franchisee when they want to

7  leave the franchise.

8        My clients didn't want to leave the franchise.  That

9  is a penalty.  They've already suffered enough on that issue.

10       So --

11       THE COURT:  Okay.

12       MS. GOODMAN:  Do you have any other particular

13  questions?  I mean, I could go -- I know it's really late, and

14  I could probably argue this all night, but I'm not sure --

15       THE COURT:  No.

16       MS. GOODMAN:  I want to be able to help you.

17       THE COURT:  Let me see if there are any other

18  questions.

19       I did have a hard time finding New Jersey case law on

20  some of these claims, but I won't burden you with it.

21       MS. GOODMAN:  I had a hard time, too.  But --

22       THE COURT:  I mean, I didn't find any New Jersey case

23  law applying a claim for negligent interference with contract

24  or business advantage.  But --

25       MS. GOODMAN:  I had a hard time finding some of those

1    cases, too.  I would argue that's why the choice of law should

2    be California.

3              THE COURT:  Just a minute.

4              Oh, on the Hawaii franchise --

5              MS. GOODMAN:  Yes.

6              THE COURT:  -- what state law do you think should

7    apply?

8              MS. GOODMAN:  I still think California law should

9    apply.  And the reason I do -- I've thought a lot about

10   this -- is because we're really dealing with, in the essence

11   of this case, we have California residents that have signed

12   franchise agreements, and we're doing business in California

13   with a Hawaii office.

14             And the purpose of the California Franchise Act is to

15   protect those residents from wrongful terminations and from

16   overreaching by the franchisee.

17             So I think that the policy -- there is a fundamental

18   policy behind -- with the statutory protections of the

19   California Franchise Investment Law and the California

20   Franchise Practice Act that warrant the application of

21   California law for these -- since they're residents of

22   California.

23             And they're pursuing -- as they say, they're pursuing

24   the claims of personal guarantees against both of these

25   individuals.

1      THE COURT:  All right.  I don't have any other

2   questions.

3      MS. GOODMAN:  Okay.  Thank you very much, Your Honor.

4      THE COURT:  Thank you.  Thank you for waiting all

5   afternoon to make such a short presentation.

6      MS. GOODMAN:  We did have one question.  I don't know

7   if Ms. Garner does.  And I assume that you're going to take

8   this under submission, correct?

9      THE COURT:  Right.

10      MS. GOODMAN:  Because I know it's a difficult issue.

11      We've got a scheduling conference, a pre-trial

12   conference I believe in three weeks.

13      THE COURT:  Let's put that over.

14      MS. GOODMAN:  That would be my -- that would be my

15   request.

16      THE COURT:  What is the conference?

17      MS. GARNER:  We're certainly in agreement with that.

18      THE COURT:  Is it just a scheduling conference or --

19      MS. GARNER:  No, it was a pre-trial conference, Your

20   Honor.  Our trial is October 30th.

21      THE COURT:  All right.  So your scheduling conference

22   is what date?

23      MS. GOODMAN:  August 20th.

24      THE COURT:  August 20th.  Let's put it over to

25   September the 17th.

22

1          MS. GOODMAN:  Okay.

2          THE COURT:  And then if we have to change the trial

3   date, we will, but we still have that trial date in case we

4   don't want to change it.

5          MS. GOODMAN:  That's fine with me.  Thank you very

6   much.

7          THE COURT:  All right.  I'll ask the Clerk to make a

8   note of that.

9          THE CLERK:  Yes, Your Honor.

10          THE COURT:  So we don't have to put it in the order,

11   just do a minute order.

12          MS. GOODMAN:  Thank you.

13          THE CLERK:  I was going to include it in today's

14   minutes.

15          THE COURT:  In the minutes?

16          THE CLERK:  Yes.

17          THE COURT:  Okay.  Thank you.

18          MS. GOODMAN:  Appreciate it, Your Honor.  Thank you.

19          MS. GARNER:  Thank you, Your Honor.

20          THE CLERK:  Court's adjourned.

21             (Proceedings were concluded at 5:35 p.m.)

22                          ---o0o---

23

24

25

1          I certify that the foregoing is a correct transcript

2      from the record of proceedings in the above-entitled matter.

3

4
                            /s/ Kathy L. Swinhart
5                           KATHY L. SWINHART, CSR #10150

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25